OK, go ahead, Mr. Wright. My name is Jack Wright. I represent Ms. Johnnie Traxler in this case. And the issue in this case is, did the visa statements constitute the use of the mails as an integral part of the defendant's use of credit cards to make unauthorized purchases? What I would like to do is to go over some of the cases that support my position, then distinguish cases by the government, and then close with congressional intent. Now, it's interesting, because Ms. Traxler's title was association executive, but we live in an era of political correctness. There are no longer any more secretaries. Nobody's a secretary anymore. You're either an administrative assistant, and she was called an associated executive. Well, she was really an administrative assistant. She took orders. What she'd do, they'd come to her and say, look, Ms. Traxler, we're going to San Diego. We're going to have a meeting there. Make all the plane reservations and motel reservations. Get us all set up. And she would do all that. And she could buy office supplies. She didn't decide that they were going for these meetings. The board executives did that. So she had the right, if she went there, to buy her own airline ticket. She could get her dress cleaned. She could buy food. She could buy a beer. She wouldn't do that, because she's a Baptist. But nevertheless, she had the right to do those things outside the city. Well, her grandmother with a credit card, she started buying inside the city of Monroe, getting her dress cleaned, buying meals, things like that. First, the idea, I'll make reimbursement. Then it got out of hand. But she ran up these bills for which she had no right to do. Now, the credit card system they used had been in effect prior to her getting there. And there were four credit cards that were no names on them. And they told her when she came, you're replacing this lady. Put your name so you're authorized to make these purchases. And she began to make unauthorized purchases. Well, I want to illustrate. So all she had to do then was we know that we're in the era of credit cards. And you just slide it through there. And they say, do you want debit or credit? And I never can remember which one. And then you get the product, and you leave. And that's it. It's all over. And that's what she did. And that was what she did that was wrong. So she didn't open any credit cards through the mail? No, ma'am. They were already open. The Visa card was already in effect when she got there. Did she use the mail to get her name put on the card as an additional authorized person or anything? You just sign up with the, I'm not sure how you do that. But you're authorized within the people she worked for to use that card. OK, so she didn't use the mail to get the card. She didn't write Visa and fill out forms for them. Did she correspond with the credit card companies in any way? Or did they just send the bills to her employer? No, they sent the bills to the employer. See, they may have stopped if they had. I mean, it took getting the bills. The employer had to get the bills in order to pay the bills. So if those bills hadn't been mailed and then paid, her scheme would have ended sooner, right? Right. Well, but you see, the unauthorized purchase completed the fraud at the time she made it. Any mailings that were done after that, and I'll go over some of these. Doesn't the case law make a distinction between one-off frauds and a continuing scheme? Well, if you want to go through, we're getting over into the latter part of this. We'll go into the Schmuck case, the Schmuck case. In the Schmuck case, you had a used car dealer. And the used car dealer then would roll back odometers, which I assume goes on a lot, and then he would sell the used car to a realtor at a reduced price, saying, look, we got this 1910 Lincoln, and it's only got 18,000 miles, and it's a really good deal. But after the dealer purchased it from the used car dealer, he then had to write the state to get the title, the tag, and the license so it wasn't complete. You had to do mailings after the sale that was done in order to complete it. So it extended it in that way, so the mailing was considered a part and an essential part of the scheme. See, the mailing has to be an essential part of the scheme without which you would not be able to get your product. One of the first cases in Conn versus the United States, there was a scheme which officers had to divert corporate funds themselves and cash the checks. They would then mail the checks to a drawery account for reimbursement. The prosecutor said, well, the mailings between the banks were as a result of the defendants cashing fraudulent checks, and therefore, that executed the scheme. The Supreme Court reversed. They said, at the time the checks were cashed, the scheme in each case reached its fruition. It cannot be said the mailings in question was the purpose of executing the scheme. And then one of the easiest ones to understand is Par versus the United States. In the school district there, they had no right to have made unauthorized purchase of gasoline. Well, as soon as they got the gasoline, put the cap on it, and drove off, the scheme was complete. The fact that later on, the Supreme Court said the statements and the payments didn't further the scheme. Scheme is over. Talk about mills. Well, that was kind of a long-running scheme. Which one? Similar to this one, USV Mills. That's our case, where the mailing that was relied on was between the two banks. In other words, you would make a deposit in one bank, and then they would have to write or wire the other bank, the drawee bank. I'm glad you brought that up. Sir? I'm glad you brought that up. I mean, this was kind of a long-running scheme, too. How long did this scheme go on, in our case? A couple of years. Didn't she have to? This is where. Didn't she have to time her purchases? No, this is the way it worked. The bills would come in. They'd get them all ready. Two corporate officers had to come in and go over, and they took two signatures on the check. They were supposed to go over and look at them, and they'd just sign them. And then the CPA, once a month, would go over it. He didn't do an audit, but he reviewed it every month. And it was just routine. They just kept on doing it. In the Mills case that you talked about, I'm glad you brought that one up. Mills was a comptroller in a Texas corporation. He had check-writing authority. Mr. Traxler didn't have check-writing authority. So he made payments to himself without his employer's knowledge. His authority allowed him to hide the fraud. She didn't have check-writing authority. She was not. And that's it. Now, a comptroller regulates and directs a business. He controls a business. That's why it's called a comptroller. But she wasn't that. She was simply an administrative assistant. The authority says that makes a difference. Me? I mean, a comptroller. I'm just showing you the difference. A comptroller controls the business. She didn't control the business. She did what she was told. That's the distance I'm trying to make on it. Well, but it seemed to me like at least one of the points in the case was that if the defendant had to take action to maintain her scheme and maintain, avoid suspicion in the way that she'd sent the mailings, then you could consider that. It seems like here, she probably had to be careful not to submit too many of these closer together. She had, in other words, she'd have to time her purchases so that it would not raise suspicions of the other officer who had to sign the check. Doesn't that, I mean, isn't that, in that sense, similar to Mills? She just made the purchases. She went along. I don't think she had a scheme by which she said, all right, I'm going to time this and only do it once a month. I think she just did what came up. But you brought it to heart. How did this get detected? Ma'am? How did this get detected, ultimately? One of her girlfriends ratted on her. She told one of her friends she was doing this, and the friend told the company? Well, there were several others who were doing the same thing. There were probably three or four other girls in the office doing the same thing. And they got in a fuss, and one of them told them. The two officers that were signing the checks never discovered it. The CPA never discovered it until right at the end. Now, let me just talk about the harmonious relationship. Is that what you brought up? Is that what you want to talk about? Now, a harmonious relationship between the victim and the defendant has gone on ever since the history of man. That's why victims are called suckers, because you get along with them. And I was trying to think, what's the oldest fraud I ever read about? In North Louisiana, we're not politically correct. We spend a lot of time reading the Bible. And so I read about Jacob and Esau. Jacob decided he'd swindle his brother. So he cooked him a meal, got his attention, and stole his birthright. That's 6,000 years old. You always get along with the people that you're. That's not a legal concept. You never met a con man you didn't like, in other words. You like them all. That's the way they do it. That's the best they are. Well, that's just part of it. It's not a legal concept. It's just part of it. And she worked there. And she got along with people. You don't go up to them and call them names and all that stuff. So you're saying that's not harmonious relations that would be legally actionable? Is that the point? Right. Let me find this case where they swindled this lady. Excuse me. Oh, here it is. For anniversary of the United States. That's a real swindle. They met this lady. She's about 45 in Vegas. And they want to get her money. So they start courting her and want to marry her. So then they say, we've got this good deal for you. You cut us a check for $35,000. We can send it off, and we'll make you part of this deal and make you some money. Well, the check was theft. So you're using the mail to further this swindle that you did on this poor lady. And well, Ms. Trexler didn't mail anything to anybody, and she didn't marry any of the corporate officers to try to get along with them better. So it's distinguishable from these cases. That's what I'm trying to do is say, I distinguish it from these cases. When I was in law school 50 years ago, that's what the smart students used to do. So if we find no jurisdiction, was this case in state court or something beforehand? No, this was interesting, because this little grandmother comes in my office, and the Secret Service is investigating. They leave President Obama to go after a Secret Service lady. I mean, a Secret Service, this lady who's writing or buying these products, which she has no authorization to do. So I thought, well, this is an interesting case. No, the state was never involved. This has always been the federal case. You know, I haven't been in federal court in 15 years. And I said, you know, I know what happened. This grandmother went crazy with this credit card. And now, but this isn't mail fraud. It just isn't. So I didn't know why. So I asked my son, who's a junior in college, to research it for me, and he found four cases. And the four cases were the four that I signed in my brief. And they all say the same thing, that the fraud is completed at the time you do it. You take the credit card, you buy it, you want credit or debit. You get the product, and you're gone. Now, in order to say, go beyond that, the mailing has to be an essential part of the scheme. Now, one of the best things that happens in going through these cases is to find the congressional intent, which makes it sound. Now, in Mays, the Mays at 414 US at 405, this is what the Mays United States Supreme Court said. Congress could have drafted the mail fraud statute so as to inquire only that the mails be, in fact, as a result of the fraudulent scheme. But it didn't do this. Instead, it required that the use of the mails must be for the purpose of executing the scheme of artifice. We reject the prosecutor's invitation to endorse a novel spin on clear statutory language in order to save a conviction. Instead, we simply adhere and enforce the plain text language of the statute. Congress has limited the scope of federal jurisdiction over mail fraud. And the prosecution in this case is seeking to exploit a truly marginal relationship to the mails and has strayed beyond the boundary established by Congress. Did the district court make any particularly factual determinations that the ongoing nature of the scheme relied upon the goodwill between the credit card company and NLAR? Did the district court make any factual determinations? I don't remember that. They, of course, had a reply brief. I wrote a brief, and they had a reply brief that stated their case, which the judge went along with. I argued it twice and then got a conditional plea so I could come here and argue here. All right, Mr. Wright, I think we have your argument. Well, I appreciate your time. I'm 81 years old, and this may be my last argument. It's been a pleasure to be here, and I have great respect. Thank you, sir. Pleasure to have you. All right, Ms. Griffin. Your Honors, my name is Mignon Griffin. I'm an assistant United States attorney for the Western District of Louisiana. I represent the appellee. I apologize in advance for my voice and my, I'm sure, soon-to-come coughing fit. Your Honor, in this case, Ms. Traxler's scheme, as devised, relied on the use of the mails. If the bills were not sent to the association and were not paid by the association, then the scheme would have collapsed. In the factual basis that was established in this case, Ms. Traxler acknowledged that she worked for the association for approximately 26 months. That was a couple of, she started a couple of months before her scheme began. She was the associate, the executive associate. She was described in the factual basis as in charge of the day-to-day operations of the association. So at the time she cast her scheme, she knew how the scheme would operate. She knew how the paying of the credit cards and the paying of the bills operated. So when she started making the personal charges, adding other people to the accounts and opening other accounts, she knew how that already worked. Open other accounts? The indictment alleges that she did, Your Honor. The indictment alleges that she did. She used the mail to do so. Are you alleging that? The indictment does not explicitly say.  that were received. Yes, ma'am. How do you distinguish the Mays case? Because in the Mays case, Your Honor, as just cast a reference earlier, that was a one-off. That was a man who stole his roommate's credit card and headed for California, figuratively. He took off with the card and charged hotel rooms and gas and various other things that he used to enjoy his time on the lam, I guess. And he did not ultimately care who or if the credit card bills were ever paid. In this case, the success of Ms. Traxler's scheme absolutely depended on the bills being received and being paid. Otherwise, it wouldn't have lasted for two years. How do you get around the Parr case? To me, that's the closest case. And as I understand it, in that case, Chloe used the company gas credit card. She got the gasoline, then the gas, the gasoline company, sent the bill to the employer who paid it. And that was the mailing that was relied on. I don't see, tell me how you distinguish that case. Well, in Parr, Your Honor, there were only two, what they described as two invoices, which I take not to be the same as two bills. I assume that that was two uses of the credit card. So while it wasn't a one-shot deal, it was only a two-shot deal. It wasn't a long, ongoing scheme as we have in this case. And the Supreme Court in Sampson, believe it was Sampson, sorry, let me check my notes here. I'm sorry, Schmuck, sorry, distinguished Parr by saying that it involved little more than a post-fraud accounting amongst the potential victims. In other words, the mailings weren't necessary to allow the scheme to continue as it was in Sampson and in Schmuck. You mean because of the number of transactions? And the length of the scheme, yes, sir. The cases seem to come down as to whether or not the mail furthered the scheme based on whether they were isolated, as in the Mays case, or whether they were long, ongoing schemes, as in the Mills case, or in another case that this court, I apologize. I've lost my place. I believe it was the Powers case, or the Powell case. I'm sorry, Wilson case, Wilson. It was a man who had a credit card belonging to the Dallas Police Union. And he made personal charges to the union's credit card over a series of, I think, around a year in the Wilson case. And the mailing in that case was not the bill coming in. It was the check going out. Regardless, this court found that the mailing did further the scheme, because it allowed it to continue on for so long. And PAR would have come out differently, you think, if the employee had used their gasoline credit card, what, half a dozen times or so, or what? I don't know that it. But if somehow, I don't know that it's necessarily like some random, like the guy who dumps the trash. If he had a credit card, for some reason, to put gas in the truck. And he put some gas in his own personal car. I don't know that the mailing would further it then. But if you're talking about a person who, in some way, is responsible for seeing that the bills were paid, so that they can help cover up the scheme, I think that's what distinguishes in that case. I don't know that's necessarily the number of transactions. We're looking at whether the mailing satisfies that element of the crime, aren't we? Yes, sir. Yes, sir. But whether the scheme, as she envisioned it, envisioned the use of the mails. And as I said, by the time she started using the credit cards, she was aware of how the system operated. She was aware of the bills coming in. And if those bills weren't coming in, then the credit card company would not continue to extend credit to the association. I would say that'd be the same thing as PAR, though. I don't know. I mean, when you use a credit card, you know a bill's going to come in. Everybody would know that. But in PAR, I do believe that the difference in PAR is that it was, as the Supreme Court said in the subsequent cases, more of a one-shot deal. They had no intention of keeping the scheme running. I think that the case that's more relevant, Your Honor, is Mills, where the comptroller was depositing the checks. He was writing himself checks. He was depositing them into his own personal bank account. And then the Federal Reserve Banks in Dallas and in Colorado were sending wire transfers between them to make the checks good. And this court found that those wire transfers did further the scheme, because it allowed it to continue. I agree there's some tension between Mills and PAR. But PAR is a Supreme Court case. And I think Justice Scalia, in his dissent in Schmuck, basically says there's a lot of tension in this area. So PAR's still on the books. I mean, I see it like Judge Davis. I think that's the most difficult case for you. I agree with Your Honor that PAR is difficult. But I think the Supreme Court has, in Schmuck and Sampson, kind of walked back PAR to some extent. They have not overruled it. But what is distinguishing on the facts is that it was more of an isolated event. And it was not a long-term, long-time, ongoing fraud, which Ms. Traxler was able to do in this case. What rule would we use? I mean, it shouldn't just be, oh, well, it's a ticky-tack factual deterrent. We need some rules, don't we? I wish there was a clear-cut rule, Your Honor. But as I look at the cases, it is more of a ticky-tack look at the facts in each case. That is how it tends to come down. Well, the one-off versus continuing scheme does seem to be a general rule. But the problem is PAR is not a one-off case. You say it's maybe a two-off case. Actually, there's not a lot of factual detail about what was going on there. There was not. And you have to look to Sampson and Schmuck to see that they describe it more as the post-fraud accounting amongst, see who gets left holding the bag, as it were, more like Mays. But I agree that PAR is the difficult case. But there have been other cases, as I said, that, including Mills and Powell, I'm sorry, Wilson. I don't know where I'm getting Powell from. Wilson, here in the Fifth Circuit, which uphold these kind of schemes under this type of fact situation. And you're arguing this straight up just on the bills. You're not relying upon other things like the PSR relied upon, right? I don't recall the factual basis. The indictment. Traxler may have been responsible for destroying credit card bills and invoices before leaving her job. That was in the PSR. But you're not relying upon that before us. You're relying upon the continuing nature of the scheme and her involvement with the billing process at the office. I think that her destroying the bills before she left entitles her and affords the court an opportunity to enhance her for obstruction. I don't really see how that contributes to the scheme. That she was trying to hide the bills and further the scheme or something. I took that, honestly, Your Honors. That's something she did at the last minute. And I might be wrong. It might be that she was trying to do that throughout the scheme to withhold from the association executive. Assessing jurisdiction, when there's not a trial here, don't we have to look at what's in the indictment? The indictment and the factual basis to the plea. And she did admit that she used the mails to further her scheme. I apologize. But she did that reserving the issue. She did, Your Honor. Yes, ma'am. She did. Yes, ma'am. I think I may have hit every. OK, I'm confused about how she was involved with the bills. Because she wasn't one of the check signers. What exactly did she do with the bills? Your Honor, the record is thin. But it's my understanding that as the person in charge of the day-to-day operations of the association, that she would at the very least receive the bills. We know that she had them because she destroyed them. But she would receive them and perhaps prepare the checks for signature by other association executives. But the record is unfortunately not very, well, it's thin. It's very thin. So. But Your Honor, as far as, and I do agree that PAR is a problem. But the Supreme Court has, in subsequent cases, including Sampson, made it clear that mailings after the fraud has occurred can support the scheme. And in this case, it's really not mailings after the fraud has occurred. It's mailings as the fraud is occurring, because it is an ongoing scheme. The count she pled guilty to fairly late. It was three months before she was terminated, yes, sir. Yes, sir, it was three months before she was terminated. So it was not early in the life. So therefore, she could not claim that she did not know how the scheme was operating at that point. Couldn't they have just charged the wires? When the car got swiped, wherever she was buying something, isn't that probably going to be an interstate wire, and they could have charged it that way, and you wouldn't be here today? I mean, they didn't, so it doesn't affect the outcome. Your Honor, if I drafted this indictment, it would be charged very different in many ways. But I didn't. But yes, I agree with that. I agree that mailing of the payment in, if, in fact, the payment was mailed, would have been, at least from a jury appeal standpoint, a sexier, so to speak, charge. But from the record, we don't know how the payment was made. We don't know if it was mailed or if it was maybe hand-delivered across the counter at the local bank that issued the credit card. This record is just very thin. I'm very sorry. Your Honor, I think with your questioning, I've covered most of my points. In this case, the relevant question is just whether the mailing furthered the scheme. And I think in this case it did, unlike Parr, where they apparently did not try to carry it on for a long time and did not have any ability to control whether or not the bills were paid. I think this case is more controlled by Wilson and Mills and that the mailings in this case did further the scheme. OK. Thank you very much, Ms. Griffin. Thank you, Your Honor. OK. Back to you, Mr. Rye. I like the record is thin because the prosecution got the burden on me. And what the Supreme Court has ruled, as I read to you, what these mailings did, they were the result of the scheme, not in furtherance of the scheme, as you would have in Schmuck and these others where you have a mailing that you had to do that, or you weren't going to get the product. No mailing, no item, no title, whatever. So my closing is that she's admitted, it's thin, and the jurisdiction is not here. She'll face whatever she has to face at other places and other times. But I thank you for your attention. Thank you. Thank you very much. And we have a case. That completes the calendar.